UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| DUSTIN WILLIAM ATCHLEY,<br><br>　　　　　　　Plaintiff,<br><br>vs.<br><br>NANCY A. BERRYHILL, Acting<br>Commissioner, Social Security<br>Administration,<br><br>　　　　　　　Defendant. | CIV. 15-5081-JLV<br><br>ORDER |

**INTRODUCTION**

Plaintiff Dustin Atchley filed a complaint appealing the final decision of

Nancy A. Berryhill, the Acting Commissioner of the Social Security

Administration, finding him not disabled.   (Docket 1).   Defendant denies

plaintiff is entitled to benefits.   (Docket 11).   The court issued a briefing

schedule requiring the parties to file a joint statement of material facts ("JSMF").

(Docket 13).   The parties filed their JSMF.   (Docket 14).   For the reasons stated

below, plaintiff's motion to reverse the decision of the Commissioner (Docket 24)

is granted.

**FACTUAL AND PROCEDURAL HISTORY**

The parties' JSMF (Docket 14) is incorporated by reference.   Further

recitation of salient facts is incorporated in the discussion section of this order.

On February 12, 2013, Mr. Atchley filed an application for disability

insurance benefits ("DIB") under Title II alleging an onset of disability date of

December 15, 2012.   Id. ¶ 1.   On July 23, 2014, the ALJ issued a decision

finding Mr. Atchley was not disabled.   Id. ¶ 4; see also Administrative Record at

pp. 9-29 (hereinafter "AR at p. ____").   The Appeals Council denied Mr. Atchley's

request for review and affirmed the ALJ's decision.   (Docket 14 ¶ 5).   The ALJ's

decision constitutes the final decision of the Commissioner of the Social Security

Administration.   It is from this decision which Mr. Atchley timely appeals.

The issue before the court is whether the ALJ's decision of July 23, 2014,

that Mr. Atchley was not "under a disability, as defined in the Social Security Act,

from December 25, 2012, [through July 23, 2014]" is supported by substantial

evidence in the record as a whole.   (AR at p. 28) (bold omitted); see also Howard

v. Massanari, 255 F.3d 577, 580 (8th Cir. 2001) ("By statute, the findings of the

Commissioner of Social Security as to any fact, if supported by substantial

evidence, shall be conclusive.") (internal quotation marks and brackets omitted)

(citing 42 U.S.C. § 405(g)).

## STANDARD OF REVIEW

The Commissioner's findings must be upheld if they are supported by

substantial evidence in the record as a whole.   42 U.S.C. § 405(g); Choate v.

Barnhart, 457 F.3d 865, 869 (8th Cir. 2006); Howard, 255 F.3d at 580.   The

court reviews the Commissioner's decision to determine if an error of law was

committed.   Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992).   "Substantial

evidence is less than a preponderance, but is enough that a reasonable mind

would find it adequate to support the Commissioner's conclusion."   Cox v.

Barnhart, 471 F.3d 902, 906 (8th Cir. 2006) (internal citation and quotation marks omitted).

The review of a decision to deny benefits is "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision . . . [the court must also] take into account whatever in the record fairly detracts from that decision." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)).

It is not the role of the court to re-weigh the evidence and, even if this court would decide the case differently, it cannot reverse the Commissioner's decision if that decision is supported by good reason and is based on substantial evidence. Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005). A reviewing court may not reverse the Commissioner's decision " 'merely because substantial evidence would have supported an opposite decision.' " Reed, 399 F.3d at 920 (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)). Issues of law are reviewed *de novo* with deference given to the Commissioner's construction of the Social Security Act. See Smith, 982 F.2d at 311.

The Social Security Administration established a five-step sequential evaluation process for determining whether an individual is disabled and entitled to DIB under Title II. 20 CFR §§ 404.1520(a). If the ALJ determines a claimant is not disabled at any step of the process, the evaluation does not proceed to the

next step as the claimant is not disabled. Id. The five-step sequential evaluation process is:

> (1) whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity to perform . . . past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove there are other jobs in the national economy the claimant can perform.

Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998). The ALJ applied the five-step sequential evaluation required by the Social Security Administration regulations. (AR at pp. 10-11).

## DISCUSSION

STEP ONE

At step one, the ALJ determined Mr. Atchley had "not [been] engaged in substantial gainful activity since December 15, 2012, the alleged onset date . . . ." Id. at p. 11 (bold omitted).

STEP TWO

At step two the ALJ found Mr. Atchley had the following severe impairments: chronic obstructive pulmonary disease ["COPD"]; obstructive sleep

apnea; obesity; mild degenerative changes of the lumbar spine; bipolar disorder;[1] and an anxiety disorder NOS[2] . . . ." Id. (bold omitted). Mr. Atchley does not challenge these findings. (Dockets 25 & 31).

Before going further in the five step evaluation process the court will address one of Mr. Atchley's issues on appeal. Mr. Atchley argues the Commissioner erred by failing to conclude that an October 5, 2016, lumbar spine MRI constitutes new evidence which dictates a remand. (Docket 25 at pp. 10-12). Mr. Atchley submits the MRI findings include:

> [A] protruding herniated disc causing moderate right foraminal stenosis at L2-3, with likely compressive effect on the exiting right L2 nerve root and possible compression of the L3 nerve root. The herniated disc contributed to mild spinal stenosis on the right. At L3-4, a broad-based bulging disc flattened the anterior subarachnoid space and caused mild spinal stenosis.

Id. at p. 10 (referencing Docket 25-1). He argues the MRI is "relevant . . . and probative" and "non-cumulative because it reveals a herniated disc with compressive effects on the spinal cord and L2, possibly L3 nerve roots. [The x-ray imaging in the record] is capable of showing spondylosis but not

---

[1] Bipolar disorder, formerly called "manic depression," is a chronic condition involving mood swings with at least one episode of mania and repeated episodes of depression. MedicineNet.com.

[2] Anxiety disorder is a chronic condition characterized by an excessive and persistent sense of apprehension with physical symptoms such as sweating, palpitations, and feelings of stress. It included agoraphobia and panic disorders. MedicineNet.com. If a diagnosis includes "NOS" that implies the diagnosis does not fit any of the officially specified diagnoses. Further diagnosis requires an expenditure of time that is generally deemed unreasonable for most primary care physicians. For this reason, physicians often use this code as a proxy for a more thorough diagnosis.

herniation." Id. Because the MRI report was not available at the time of the administrative proceeding, Mr. Atchley argues "good cause" exists to compel the Commissioner on remand to consider this new evidence. Id. at p. 12.

The Commissioner opposes Mr. Atchley's argument asserting plaintiff "failed to prove that his lumbar MRI, dated more than two years after the ALJ issued the decision, is material to his condition during the period the ALJ addressed. Not only was the evidence not generated during the period under review, the evidence was not even created in close proximity to the relevant time period." (Docket 30 at p. 6). The Commissioner argues "[a]lthough Atchley contends the MRI 'likely relates back to the events reported on October 2, 2012[,] . . . .' he has failed to show that the MRI explains his condition during the period the ALJ addressed and not some subsequent injury or deterioration." Id. (citing Docket 25 at p. 11). The Commissioner points out the MRI specifically references a February 2016 x-ray. Id. at p. 7. Instead of being applicable to the 2012-2014 period under review by the ALJ, the Commissioner submits the MRI should be considered in the record of a DIB application filed November 19, 2015. Id. at p. 5 n.3.

In rebuttal, Mr. Atchley argues the MRI constitutes "concrete evidence relating back to the relevant period." (Docket 31 at p. 2). Mr. Atchley contends he "had [a] sudden onset of symptoms unique to [the] L2-3 injury, reported five days after onset to his treating physician on October 3, 2012[,] . . . and that these

new symptoms coincided with his final work stoppage soon afterward." Id. (referencing Docket 14 ¶ 69).

The court "may remand a case to have additional evidence taken 'but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.' " Hepp v. Astrue, 511 F.3d 798, 808 (8th Cir. 2008) (quoting 42 U.S.C. § 405(g)). "To be material, new evidence must be non-cumulative, relevant, and probative of the claimant's condition for the time period for which benefits were denied, and there must be a reasonable likelihood that it would have changed the Secretary's determination." Woolf v. Shalala, 3 F.3d 1210, 1215 (8th Cir. 1993). "Good cause does not exist when the claimant had the opportunity to obtain the new evidence before the administrative record closed but failed to do so without providing a sufficient explanation." Hepp, 511 F.3d at 808.

On October 3, 2012, Dr. Van Egeraat found Mr. Atchley's "back was tender to palpation. He had normal lumbar range of motion and negative straight-leg-raising test bilaterally. . . . He had normal range of motion in all joints tested in the upper and lower extremities. His motor and sensory examination was intact in both upper and lower extremities. His deep tendon reflexes were normal." (Docket 14 ¶ 70). Because Mr. Atchley complained of low back pain, "Dr. Van Egeraat assessed lumbar radiculopathy" and ordered spinal x-rays.

Id. ¶ 71.   Those x-rays showed only "mild degenerative changes in the lumbar spine [when compared to earlier x-rays], nothing acute."   Id. ¶ 72.

The ALJ concluded Mr. Atchley had a severe impairment of "mild degenerative changes of the lumbar spine."   (AR at p. 11) (bold omitted).   The court is not convinced the 2016 MRI relates to Mr. Atchley's condition during the period under review by the ALJ, particularly the October 2012 incident which Mr. Atchley asserts is tied to the MRI and its findings.   While Mr. Atchley could not have presented the MRI report until after its creation in October 2016, the court finds no good cause exists under § 405(g) warranting a remand to the Commissioner.   Mr. Atchley's request to remand his case to the Commissioner on this basis is denied.

STEP THREE

At step three, the ALJ determines whether claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 ("Appendix 1"). 20 CFR §§ 404.1520(d), 404.1525, and 404.1526.   If a claimant's impairment or combination of impairments meets or medically equals the criteria for one of the impairments listed and meets the duration requirement of 20 CFR § 404.1509, the claimant is considered disabled.   At that point the Commissioner "acknowledges [the impairment or combination of impairments] are so severe as to preclude substantial gainful activity. . . . [and] the claimant

is conclusively presumed to be disabled." Bowen v. Yuckert, 482 U.S. 137, 141 (1987). A claimant has the burden of proving an impairment or combination of impairments meet or equals a listing within Appendix 1. Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004). If not covered by these criteria, the analysis is not over, and the ALJ proceeds to the next step.

At this step the ALJ determined plaintiff's severe impairments did not meet or equal a listing under Appendix 1. (AR at p. 12). Mr. Atchley challenges the ALJ's decision. (Docket 25 at pp. 12-17).

Mr. Atchley argues the ALJ should have considered the combination of his severe impairments as medically equal to the paragraph "B" criteria of Listing 12.04.[3] Id. at p. 14. The "paragraph B" criteria for Listing 12.04 assesses "functional limitations" in "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." (Appendix 1 Listing 12.00(1)(C)).

Mr. Atchley claims the ALJ improperly only considered Mr. Atchley's impairments separately, but not in combination. (Docket 25 at p. 14). In addition, Mr. Atchley argues the ALJ "failed to consider whether the effects of sleep apnea impacted on the 'B' criteria." Id. Finally, Mr. Atchley submits "[t]he ALJ assessed the 'B' criteria . . . without acknowledging the substantial evidence of Atchley's inability to perform tasks on any kind of sustained basis-

_____

[3]Listing 12.04 focuses upon affective disorders which are "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation." Appendix 1 Listing 12.04.

a crucial element in the assessment of mental impairments . . . and medical equivalency." Id. at p. 15 (referencing AR at p. 13 and Appendix 1 Listing 12.00F.2).

The ALJ found no restrictions of activities of daily living. (AR at p. 14). Mr. Atchley argues this finding is contrary to the substantial evidence in the record. (Docket 25 at p. 15) (referencing Docket 14 ¶¶ 17-19, 33, 36, 46, 54, 100, 109 & 113).

In the area of social function,[4] the ALJ found Mr. Atchley had "moderate difficulties." (AR at p. 14). The ALJ found "[t]here is minimal evidence of communicative deficits in the record or difficulty interacting with others; however, the claimant reports depression, anxiety, and mood swings." Id. Mr. Atchley argues his social functioning is "so impaired that he could not be around people on a sustained basis." (Docket 25 at p. 15) (referencing Docket 14 ¶¶ 21, 25, 34, 36-37, 40 & 98). Mr. Atchley contends the ALJ failed to

---

[4]"Social functioning refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers. You may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation. You may exhibit strength in social functioning by such things as your ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities. [The agency] also need[s] to consider cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity. Social functioning in work situations may involve interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers." (Appendix 1 Listing 12.00(1)(C)(2)).

properly consider the mental status examination by his therapist, Janet Opoien Twedt, in October 2013, in which she described him "as guarded, minimally cooperative, with direct and unblinking eye contact, flat affect and minimal speech." Id. at p. 16 (referencing Docket 14 ¶ 113).

With respect to concentration, persistence or pace,[5] the ALJ found Mr. Atchley "has moderate difficulties. . . . because of mental symptoms. . . . [but] claimant's cognitive skills are adequate." (AR at p. 14). Mr. Atchley asserts the ALJ erred by failing to properly consider Ms. Twedt's report, the statement of Mr. Atchley spouse, Casey Atchley, and his own testimony. (Docket 25 at p. 16) (referencing Docket 14 ¶¶ 23, 38-39, 55, 115 & 138).

The ALJ found Mr. Atchley "experienced no episodes of decompensation which have been of extended duration."[6] (AR at p. 14). Mr. Atchley argues this

---

[5]"Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings. Limitations in concentration, persistence, or pace are best observed in work settings, but may also be reflected by limitations in other settings. In addition, major limitations in this area can often be assessed through clinical examination or psychological testing. Wherever possible, however, a mental status examination or psychological test data should be supplemented by other available evidence." (Appendix 1 Listing 12.00(1)(C)(3)).

[6]"Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). . . . The term repeated episodes of decompensation, each of extended duration in these listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks. If you

finding is faulty because the ALJ "failed to consider Atchley's ups and downs, consistent with his bipolar disorder . . . with episodes lasting one to three days and occurring three to four times a month." (Docket 25 at pp. 16-17) (referencing Docket 14 ¶¶ 55 & 116-17). He argues the ALJ's conclusion failed to consider the "impact[] of back pain and shortness of breath, which seemed to occur together and were worse one or two days a week, resulting in his getting nothing done on those days." Id. (referencing Docket 14 ¶ 54).

Mr. Atchley urges the court to remand his case and require the Commissioner to evaluate whether his severe impairments in combination qualify as "medical equivalence" in Listing 12.04. Id. at p. 17 (referencing SSR 96-6p[7]).

The Commissioner points out SSR 96-6p was rescinded and replaced by SSR 17-2p[8] effective March 27, 2017. (Docket 30 at p. 8 n.4). "The Commissioner has instructed adjudicators to cite SSR 17-2p, rather than the rescinded SSR 96-6p, even in cases filed before March 27, 2017." Id. (referencing Hearing and Appeals Law and Litigation Manual (HALLEX) I-5-3-30, 2017 WL 1362776, at *5 (2017)). However, the HALLEX directs that "[f]or

---

have experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, [the agency] must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence." (Appendix 1 Listing 12.00(1)(C)(4)).

[7]SSR 96-6p, 1996 WL 374180 (July 2, 1996).

[8]SSR 17-2p, 2017 WL 1105349 (March 27, 2017).

claim(s) filed before March 27, 2017, adjudicators must use the prior rules throughout the entire appeals process."   HALLEX I-5-3-30, 2017 WL 1362776, at *5.   For purposes of this appeal, the court will reference SSR 96-6p, since it was the regulation in effect and applicable to the ALJ's analysis in Mr. Atchley's case.

SSR 96-6P specifically provided that "[t]he administrative law judge . . . is responsible for deciding the ultimate legal question when a listing is met or equaled. . . . However, longstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge . . . must be received into the record as expert opinion evidence and given appropriate weight."   SSR 96-6p, 1996 WL 374180, at *3.   The policy statement of the regulation "emphasize[s]" that "[a]n updated medical expert opinion must be obtained by the administrative law judge . . . before a decision of disability based on medical equivalence can be made."   Id., 1996 WL 374180, at *1.   This policy is reinforced as the regulation states that "an administrative law judge and the Appeals Council must obtain an updated medical opinion from a medical expert . . . [w]hen additional medical evidence is received that in the opinion of the administrative law judge . . . may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments."   Id., 1996 WL 374180, at *3-4.

NON-EXAMINING, CONSULTING PSYCHOLOGISTS

Critical to the determination at step three was the ALJ's decision to give exclusive consideration to the opinions of the non-examining, consulting psychologists, Dr. Stephanie Fuller and Dr. Jerome Buchkoski. (AR at p. 12). The ALJ stated "the assessments of the DDS [Disability Determination Services] physicians are a medical opinion that the claimant does not meet or equal any listing of impairment." Id. at p. 12 (referencing AR at pp. 71-82 and 84-96). The ALJ used the term physicians to refer to the assessments by Dr. Fuller, a psychologist; Dr. Tom Burkhart, a physician; Dr. Buchkoski, a psychologist; and Dr. Kevin Whittle, a physician. See id. at pp. 71-82 and 84-96. Because Mr. Atchley only challenges the ALJ's decision as to Listing 12.04, a mental impairment, a detailed discussion of the opinions of Dr. Burkhart and Dr. Whittle regarding physical impairment is not necessary at this point.

Dr. Fuller conducted a records review on May 6, 2013, to assess Mr. Atchley's mental impairment under the "B" criteria. (Docket 14 ¶ 129; see also AR at pp. 71-82). On August 19, 2013, Dr. Buchkoski completed a records review and agreed with Dr. Fuller's assessment of the "B" criteria. (Docket 14 ¶ 135; see also AR at pp. 92-94). Without specifically indicating so, the ALJ adopted Dr. Fuller's and Dr. Buchkoski's findings on the "B" criteria for mental impairment. Compare Docket 14 ¶¶ 129-133 & 135 and AR at p. 14.[9]

---

[9]The ALJ's table of the " 'B' Criteria" indicates Mr. Atchley had "none" [no] restrictions of his activities of daily life, but the text indicates a "mild restriction" in this area. See AR at p. 14. The court assumes the ALJ intended his written decision, as opposed to the table, to be his finding since that finding coincides with the opinions of Dr. Fuller and Dr. Buchkoski.

The court finds the opinions of Dr. Fuller and Dr. Buchkoski are not entitled to substantial weight in the step three analysis. SSR 96-6p specifically mandates that a non-examining, consulting psychologist review all of a claimant's records. That simply did not occur in this case. For each psychologist, consider the following:

> Dr. Fuller's opinion of May 6, 2013, was issued before documents for May 17, 2013, through May 2, 2014, were added to the administrative record. See Docket 14 ¶ ¶ 44-57, 102-128 and 136; and

> Dr. Buchkoski's opinion of August 19, 2013, was submitted before documents for October 11, 2013, through May 2, 2014, were added to the administrative record. See Docket 14 ¶ ¶ 47-57, 102-128 and 136.

While Dr. Fuller and Dr. Buchkoski had the benefit of the opinions of Dr. Gilbertson (Docket 14 ¶¶ 85-100), they did not have access to any of the mental health records of Behavior Management Systems of Rapid City, South Dakota, or the medical records of the Community Health Center of the Black Hills of Hot Springs, South Dakota, after May 7, 2013 and August 20, 2013, respectively. Non-examining sources should be given less weight especially if those sources "did not have access to relevant medical records, including relevant medical records made after the date of evaluation." McCoy v. Astrue, 648 F.3d 605, 616 (8th Cir. 2011) (citing Wildman v. Astrue, 596 F.3d 959, 968 (8th Cir. 2010)).

Opinions without consideration of these records "fairly detracts from [the] decision" of the ALJ to adopt Dr. Fuller's and Dr. Buchkoski's opinions. Reed, 399 F.3d at 920. Because their opinions cannot be used to resolve the step three analysis relating to Listing 12.04, the ALJ must secure "[a]n updated

medical opinion . . . before a decision of disability based on medical equivalence can be made." SSR 96-6p, 1996 WL 374180, at *1.

Before closing this order, the court is compelled to address three additional issues raised by Mr. Atchley. Those are the decisions of the ALJ (1) to reject the statement of Casey Atchley; (2) to not fairly judge Mr. Atchley's credibility; and (3) to not give significant weight to the opinion of Janet Opoien Twedt.

CASEY ATCHLEY

The ALJ stated: "I have considered the evidence of Casey Atchley, the claimant's wife . . . I cannot give full weight to it for the following reasons. This person's evidence is colored or influenced by friendship with or affection for the claimant. This person's evidence is inconsistent with the objective medical evidence and the record as a whole. Moreover, I note that Mrs. Atchley did not give evidence under oath." (AR at p. 18) (referencing AR at pp. 242-52).

As the court previously noted:

> [F]amily members "always have a stake in the claim" because it is their child, spouse or other family member who is seeking Social Security benefits. If this relationship was a valid basis for rejecting the testimony of a family member, the regulations would specifically direct an ALJ to disregard the statements and observations of these individuals. To the contrary, the regulations encourage an ALJ to seek the testimony of family members because they have the most frequent contact and exposure to the claimant's physical and mental impairments. See 20 CFR §§ 404.1512(b)(1)(iii) . . . and 404.1513(d)(4) . . . . Consideration of third party statements also must be considered when an ALJ is evaluating a claimant's pain. See 20 CFR § 404.1529(a).

Dillon v. Colvin, 210 F. Supp. 3d 1198, 1207 (D.S.D. 2016).

"Evidence includes . . . [s]tatements . . . others make about your impairment(s), your restrictions, your daily activities, your efforts to work, or any other statements you make to medical sources during the course of examination or treatment, or to us during interviews, on applications, in letters, and in testimony in our administrative proceedings . . . ." 20 CFR § 404.1512(b)(1)(iii). "In addition to evidence from the acceptable medical sources . . . . [the agency] may also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work. Other sources include, but are not limited to . . . . Other non-medical sources (for example, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, and clergy). . . ." 20 CFR § 404.1513(d)(4).

Mrs. Atchley's functional report describes in vivid detail how her husband's condition deteriorated over the years immediately before applying for DIB and afterward. He used to work eight to ten hours a day, took care of the yard, worked on their cars and went camping with the family. (Docket 14 ¶ 30). "He was unstoppable and loved to stay busy . . . . [H]e could pay bills, count change, handle a savings account, and use checkbook/money orders." Id. ¶¶ 30 & 34. "[S]ince his BiPolar diagnosis these [money handling] skills have been greatly compromised. [His] ability to run a household just isn't the same . . . . [H]e can do light cleaning & laundry, home repairs are difficult and can only spend 10-15 min doing yard work . . . . [W]hen he dose [sic] dishes he must take frequent breaks to sit–it may take him an hour or more." Id. ¶¶ 33-34.

Mrs. Atchley stated her husband's ventures away from the house are "[n]ot often at all . . . . [H]e keeps himself so secluded and I believe it's due to his depression." Id. ¶ 34. She acknowledged he was able to drive a car and shop for groceries "once a week for 20-30 minutes. . . . He went [outside the house] only when it's necessary and as little as possible." Id. ¶¶ 34 & 36 (internal quotation marks omitted). She described him as "so moody and unpredictable at times. He isn't physical but can get upset easly [sic] & the next second he could be happy. . . . Dustin is not social & dosnt [sic] take part in many social activities, groups cause him anxiety." Id. ¶ 37. She "believe[s] Dustin's COPD, BiPolar depression anxiety and back injury has [sic] taken a piece of every part of him." Id.

Mrs. Atchley estimated he could walk a maximum of 5 minutes before needing to rest. Id. ¶ 38. She wrote his attention span "depends on the minute" and "he 'rarely' finished what he started." Id. In conclusion, Mrs. Atchley described his condition in the following manner:

> Dustin is simply not the man he once was. This back has evolved so much he can do so little physical work it causes his depression to escalate and now he has . . . COPD to contend with. I will do anything short of begging to see him get the help he deserves! He has worked so hard since he was 14 years old. In the 25 years we were together I can't remember more than 5 or 6 days he didn't go to work because he was sick. He is far from being lazy and would be a productive part of society & support himself if he could!

Id. ¶ 43.

"Conditions such as . . . bipolar disorder and anxiety disorder are conditions commonly known to wax and wane. It is not unexpected for an

individual with these conditions to appear and act healthy, while at other times to suffer from the extreme, debilitating problems these physical and mental conditions cause." <u>Dillon</u>, 210 F. Supp. 3d at 1209. Mrs. Atchley's testimony is consistent with the medical and psychological records of her husband's treating health providers and with his testimony.

Nowhere in the Social Security Act or the regulations is there a requirement that a family member's statement must be made under oath. For the ALJ to reject consideration of Mrs. Atchley's statement on these two grounds and to then simply dismiss her statement as contrary to the objective medical evidence and the record as a whole is contrary to the regulations and this record.

"Failure to consider [Mrs. Atchley's] testimony is contrary to the regulations. 20 CFR §§ 404.512(b)(1)(iii), 404.1513(d)(4), and 404.1529(a). The conclusion to give her . . . testimony little or no weight is not supported by substantial evidence and the ALJ did not provide good reasons for discounting the testimony." <u>Id.</u> In addition, the refusal of the ALJ to consider Mrs. Atchley's description of her husband's activities of daily living impact the step four analysis of establishing a residual functional capacity ("RFC") for him.

<u>DUSTIN ATCHLEY</u>

As discussed above, the ALJ concluded Mr. Atchley had a mild restriction in his activities of daily living, moderate difficulties in the area of social functioning and concentration, persistence or pace, and no episodes of decompensation. To arrive at these conclusions, the ALJ not only rejected Mrs.

Atchley's statement, but also found Mr. Atchley's statements not fully credible. (AR at p. 16).

First, the ALJ stated "it was reported the claimant prepares meals, does light household chores, drives and goes shopping." Id. at p. 17. This report is derived from Mrs. Atchley's statement, which the ALJ discredited because she was a family member and the statement was not made under oath. Additionally, the ALJ failed to include the complete statement of Mrs. Atchley describing the limitations her husband's physical and mental impairments impose on these activities of daily living. The ALJ cannot have it both ways.

The ALJ discounted Mr. Atchley's credibility based on inconsistent statements about illegal drug use. Id. In an April 2013 evaluation with Dr. Jackie Gilbertson, Mr. Atchley admitted "[m]arijuana abuse began at age 14. Dustin reports using cocaine abusively for 4 years, as well as meth for 4 to 6 years. His last use of marijuana was 3 years ago. His last use of cocaine was 4 years ago." (AR at p. 297; see also Docket 14 ¶ 95). The ALJ found Mr. Atchley's hearing testimony contradicted this statement as he "testified that he has not used any illegal drugs other than marijuana. However prior to the hearing the claimant reported he has used cocaine . . . . In addition, the claimant testified he last used marijuana in 2009. However, prior to the hearing, the claimant reported he last used marijuana three years ago -- i.e., in 2010 . . . ." (AR at p. 17) (referencing AR at p. 297).

Mr. Atchley's testimony during the May 2014 hearing included the following exchange with the ALJ about drug use:

Q.      Alcohol, street drugs play any role in not looking for work or not being able to work?

A.      No, sir.

Q.      When did you last use alcohol?

A.      I quit drinking alcohol back around 2009 when I was prescribed the medicines for the bipolar and the manic-depressive.

Q.      When did you last use street drugs?

A.      Street drugs haven't been used in about the same amount of manner [sic] 2009.

Q.      Before 2009 what were you using?

A.      Before 2009 I was a chronic drinker, and I did use some marijuana.

Q.      Any other illegal drug or any other street drugs?

A.      No, sir.

Id. at pp. 38-39.   The ALJ never went back to clarify the time period when Mr. Atchley used cocaine or methamphetamine, whether that drug use was years ago or during the time period 2009-2012, or until 2014, or whether the last marijuana use was around 2009 or actually in 2010.   Mr. Atchley reported to Ms. Kautzman of Behavior Management Systems in January 2014 that he "experimented with cocaine, cannabis, and alcohol from ages 17 to 29. . . . He said that substance abuse was no longer an issue . . . ."   (Docket 14 ¶ 124).

The ALJ discounted Mr. Atchley's credibility because in a functional report he said the maximum distance he could walk was "1 block," while at the hearing he testified being able to walk "2 blocks." (AR at p. 17). In the February 2013 functional report, Mr. Atchley wrote he was able to walk "1 block" before needing to stop and rest. Id. at p. 234. During the May 2014 hearing, Mr. Atchley testified the farthest he could currently walk before needing to stop and rest was two blocks. Id. at p. 55. The ALJ did not want to talk about his ability to walk on "one of [his] bad days when [he's] down," but only on "a good day." Id. at p. 54. Was Mr. Atchley referencing a bad day when he wrote 1 block? Is this minor variation a discrepancy without a significant difference?

The ALJ criticized Mr. Atchley about his use of oxygen ["O2"], because he "asserted on one page that he has been prescribed oxygen, but cannot afford it . . . . Yet on another page, the claimant said he is using oxygen in the evenings." Id. at p. 17 (referencing a comparison of AR at pp. 236-37). Mr. Atchley's statement at page nine of the administrative record "I have been prescribed oxygen, but I can not afford it" is not dated, while his functional report at page eight "Ive [sic] been diagnosed COPD making necessary for me to be on oxygen in the evening" was signed on February 27, 2013. Id. These statements are not inconsistent as one is merely declaring that he was prescribed O2, but could not afford it, while the other statement says that as of February 27, 2013, he is using O2 at night.

The record indicates Mr. Atchley was first prescribed O2 in 2012 for use at night. (Docket 14 ¶ 80). In February 2013, he acknowledged the O2 helped but at $50 a month he could not afford it. Id. At some point in time, Mr. Atchley obtained financial assistance to get O2. Id. ¶ 120. Once 02 was available to him in May 2013, Mr. Atchley reported using it at night. Id. ¶ 103. He continued to use 02 through the remainder of the time prior to the administrative hearing. Id. ¶¶ 120 & 123. He was using three, to three and one-half, liters of O2 every night. Id. The ALJ's conclusion that these statements were inconsistent is contrary to the record and is an inappropriate factor upon which to judge Mr. Atchley's credibility.

The example of exaggeration used by the ALJ to discount Mr. Atchley' creditability was "level of education." (AR at p. 18). The ALJ noted Mr. Atchley "understated the level of his education. The claimant testified during the hearing that the highest grade he completed in school was the 8th grade. However, prior to the hearing the claimant reported having completed the 9th grade . . . ." Id. (referencing AR at p. 219). Those apparent differences were reconciled by Mr. Atchley in response to the ALJ's questions during the hearing:

Q. What's the highest grade you finished in school?

A. Eighth grade.
. . .
Q. Paperwork -- somebody put down on your paperwork ninth grade. Which is correct?

A. I attended the ninth grade, but I did not complete it.

Id. at pp. 37-38.   Mr. Atchley's explanation is a fair clarification of the apparent discrepancy.   It is hardly an exaggeration and not a factor the ALJ should use to judge credibility.

The ALJ discounted Mr. Atchley's credibility because of an apparent refusal on his part to cooperate with a breathing capacity test.   Id. at p. 18 (referencing AR at p. 292).   The phrase in question stated: "[Patient] appeared to understand instructions, but didn't perform maneuvers as instructed."   Id. at p. 292 (capitalization omitted).   It is unclear from this statement whether Mr. Atchley, in fact, understood the instructions or did not perform the breathing maneuvers as requested because of a mental or physical impairment.   It is certainly improper for the ALJ to conclude that one alternative explanation was more probable than the other.   In fact, the therapist repeated a number of maneuvers several times and achieved results which appeared to be valid. (Docket 14 ¶ 84).

Finally, the ALJ challenged Mr. Atchley's credibility on the issue of his need to lie down during the day.   The ALJ found Mr. Atchley "either overstated or magnified the amount of time he has to lie down . . . . [he] testified that he lies down between 60-90 minutes each day . . . [and] this has been the case since December 2012."   (AR at p. 18).   The ALJ rejected this testimony on the basis "the medical records did not contain any such reports by any of the claimant's health care professionals."   Id.

It is undisputed Mr. Atchley suffers from chronic back pain and frequently complained of it during clinical visits. (Docket 14 ¶¶ 12, 65, 66, 69, 73, 77, 105 & 107). Over the years, Mr. Atchley was prescribed Flexeril for muscle spasms and Oxycodone for low back pain relief. Id. ¶¶ 8, 66, 67, 70, 74, 107 & 126. His failure to report to his doctors the need to lie down every day "is not a severe blow to his credibility," particularly when he consistently complained of back pain, made many clinical visits for back pain and was given prescription medications. Holmstrom v. Massanari, 270 F.3d 715, 722 (8th Cir. 2001) (referencing Taylor v. Chater, 118 F.3d 1274, 1277-78 (8th Cir. 1997)). "[T]he lack of information contained in any of the reports completed by [Mr. Atchley's] doctors does not qualify as an inconsistency in the evidence as a whole." Taylor, 118 F.3d at 1278.

The court concludes there are "no inconsistencies in the record that justify finding [Mr. Atchley] not credible." Id. The decision of the ALJ to find Mr. Atchley not credible is unsupported by the substantial evidence in the record. The evidence supporting Mr. Atchley's credibility "fairly detracts from [the Commissioner's] decision." Reed, 399 F.3d at 920 (quoting Haley, 258 F.3d at 747); Morse v. Shalala, 32 F.3d 1228, 1229 (8th Cir. 1994). When examined in detail, the records support rather than contradict the testimony of Mr. Atchley. Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Guilliams, 393 F.3d at 801-02. As a result, the court finds the ALJ's credibility determination is not supported by substantial evidence.

"It [is] the ALJ's responsibility to determine [a claimant's] RFC based on all the relevant evidence, including medical records, observations of treating physicians <u>and others, and [the claimant's] own description of [his] limitations</u>." <u>Anderson v. Shalala</u>, 51 F.3d 777, 779 (8th Cir. 1995) (emphasis added) (citing 20 CFR §§ 404.1545-46, 416.945-46). The decision of the ALJ to discount Mr. Atchley's description of his physical and mental limitations and their impact on his activities of daily living affect the step three analysis as well as the step four analysis in establishing a RFC.

<u>MS. TWEDT</u>

Ms. Twedt completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) ["MSS-Mental Report"]. (AR at pp. 368-70). The ALJ acknowledged he "considered the opinions of Ms. Janet Opoien Twedt." <u>Id.</u> at p. 22 (referencing AR at pp. 368-70). But the ALJ stated the "progress notes from this source do not support her opinions. Mental status exam was within normal limits. Just two months prior to the completion of this assessment, it was noted the claimant reported improvement in motivation as well as increased energy. He was found to be more animated and was participating in family activities. There is no evidence of worsening." <u>Id.</u> at p. 24.

The ALJ chose to give "more weight to the opinions" of the non-examining, consulting psychologists over the opinions of Ms. Twedt. <u>Id.</u> at p. 22. "In this case, the treating sources . . . are not experts in the evaluation of SSA disability

claims. Because of this lack of knowledge of and experience in applying SSA disability programs and their regulatory and evidentiary requirements, I give less weight to the treating source opinions." Id. at p. 25. Other factors the ALJ considered were that Ms. Twedt "did not review any medical records other than their [sic] own. . . . [her] opinions are less consistent with the longitudinal record . . . and [her] opinions are not supported by the relevant evidence to the same degree as the medical source opinions cited earlier in this decision." Id. The ALJ found "Ms. Opoien Twedt presented little relevant supporting evidence, and provided less satisfactory supporting explanations, for the opinions given. . . . Indeed, many of the opinions of this medical source were simply checked boxes." Id. Finally, the ALJ gave less weight to Ms. Twedt's opinions because she "is neither a psychologist nor psychiatrist, but rather a licensed mental health professional counselor (LPC-MH), and is therefore not an acceptable medical source." Id.

For the reasons discussed above, the opinions of the non-examining, consulting psychologists do not constitute substantial evidence. Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998) ("The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence.").

Furthermore, the decision of the ALJ ignores the fact Ms. Twedt is on the staff of the Behavior Management Systems Clinic and has access to all of Mr. Atchley's psychological records. Ms. Twedt, in addition to having a Masters

Degree in social work, is a national certified counselor ("NCC"), a licensed professional counselor - mental health (LPC-MH"), as well as a qualified mental health provider ("QMHP").

Totally ignored by the ALJ is the fact that Ms. Twedt's counseling notes, reports and recommendations were reviewed by a certified nurse practitioner, Lisa Kautzman, who completed a psychiatric evaluation at Ms. Twedt's request. (AR at pp. 355). During the mental status examination she found Mr. Atchley "knew the month and year but not the date. . . . He was able to name the current and the former US president, do simple monetary calculations, and attempted one of two proverbs. He was unable to complete serial 7's or 3's; but he was able to count backward from 20." (Docket 14 ¶ 125). CNP Kautzman noted "[h]is affect was restrictive. He was pleasant and cooperative. Insight, judgment, and impulse control were fair to guarded." Id.

It was the Behavior Management Systems team which concluded Mr. Atchley required a case service plan. Id. ¶ 127. In addition to the positives noted by the ALJ above, he did not note the report also included the following description of Mr. Atchley's condition:

> A negative outlook and occasional feelings of hopelessness are ongoing. Dustin continues to struggle with regaining function and with finding resources for his family . . . . Without ongoing BMS services to address his illness, how to cope with it, and how to locate needed services, Dustin would be at greater risk for relapse in his symptoms control, and possible consequences, both legal and interpersonal, that he has experienced in the past.

Id. ¶¶ 127-28.   Contrary to the ALJ's determination, these findings are consistent with the longitudinal record.   Id. ¶¶ 75-77, 79-82, 96, 101, 109, 111, 113 and 119.

Most disingenuous among the reasons for giving little weight to the opinions of Ms. Twedt is the ALJ's statement that the MSS-Mental Report she completed was mostly "checked boxes."   (AR at p. 25).   The report itself is a SSA form which instructs the mental health professional to "check the appropriate block to describe the individual's restrictions in the following work-related mental activities."   Id. at p. 368.   Ms. Twedt followed the instructions by checking the blocks she felt most appropriately described Mr. Atchley's mental condition, but in addition, she included a written mental diagnosis, a statement about his major functional impairments and other diagnostic comments.   Id. at pp. 369-70.   Concerning the blocks checked, the form describes the five levels of "the individual's ability to perform the activity" to be considered.   Id. at p. 368. What more can the ALJ expect from a mental health professional completing this SSA form?   The form itself does not ask the clinician to attach medical or clinical records to support the findings indicated.   It was not necessary for Ms. Twedt to formally incorporate the clinical reports and diagnostic findings of the team of mental health professionals at Behavior Management Systems.   She was entitled to rely upon the clinical and diagnostic findings and treatment provided by these mental health care providers.

On remand, the ALJ is obligated to consider and weigh the opinions of Ms. Twedt and Ms. Kautzman at step three. In addition, these opinions must be weighed in establishing Mr. Atchley's RFC at step four. The court trusts on remand the Commissioner will direct an ALJ to conduct a proceeding consistent with the requirements of the five-step sequential evaluation process for determining whether an individual is disabled. 20 CFR § 404.1520(a)(4).

## ORDER

Based on the above analysis, it is

ORDERED that plaintiff's motion to reverse the decision of the Commissioner (Docket 24) is granted.

IT IS FURTHER ORDERED that, pursuant to sentence four of 42 U.S.C. § 405(g), the case is remanded to the Commissioner for rehearing consistent with this decision.

Dated February 28, 2018.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
CHIEF JUDGE